

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

ENTERED
07/16/2013

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| MAURICE TAYLOR and | ) | CASE NO. 11-32161-H3-7 |
| TIFFANY TAYLOR, | | |
| | ) | |
| Debtors, | ) | |
| | ) | |
| NERSES "NICK" TAJIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 11-3521 |
| | ) | |
| MAURICE D. TAYLOR, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

The court has held a trial, over the course of eight days, in the above captioned adversary proceeding.  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Findings of Fact</u>

<u>Procedural History In This Court</u>

Maurice Taylor filed a voluntary petition under Chapter 7 of the Bankruptcy Code, in Case No. 11-32161-H3-7, on March 9, 2011.  Tiffany Taylor, the spouse of Maurice Taylor, filed a

voluntary petition under Chapter 7 of the Bankruptcy Code, in Case No. 11-32193-H3-7, on March 10, 2011.  The two cases were substantively consolidated, by order entered on August 24, 2011 (Docket No. 46, Case No. 11-32161-H3-7).[1]  A discharge of both Debtors was entered on August 9, 2012.  The underlying Chapter 7 case was closed on August 9, 2012.  Randy W. Williams was the Chapter 7 Trustee.

Prior to the substantive consolidation of the two Chapter 7 cases, Nerses "Nick" Tajian filed separate adversary proceedings against Maurice Taylor (Adv. No. 11-3255) and Tiffany Taylor (Adv. No. 11-3254).  After consolidation of the Chapter 7 cases, Tajian filed a third adversary proceeding, Adv. No. 11-3521, against Maurice Taylor, Tiffany Taylor, and the Chapter 7 Trustee.  In addition, Tajian filed an objection to Debtors' claim of exemptions (Docket No. 59, Case No. 11-32161-H3-7).  The court subsequently consolidated Adversary Nos. 11-3255, 11-3254, 11-3521, and the objection to exemptions into the instant adversary proceeding, Adv. No. 11-3521.  (Docket No. 69, Case No. 11-32161-H3-7).

After consolidation of the three adversary proceedings and the objection to exemptions, Tajian sought leave to file an

---

[1]In this opinion, "Debtors" refers to both Maurice Taylor and Tiffany Taylor, and "Taylor" refers to Maurice Taylor, except where Tiffany Taylor is identified as "Tiffany Taylor."

amended complaint.  Tajian asserted that the purpose of the amended complaint was to "state all of the factual allegations contained in the various complaints and his causes of action in one complaint."  (Docket No. 38).  The court granted leave to amend the complaint.  Tajian's amended complaint appears at Docket No. 39 in the above captioned adversary proceeding.

Prior to consolidation of the adversary proceedings and the objection to exemptions, Debtors filed nearly identical answers and counterclaims in each of Adversary No. 11-3254 (Docket No. 12, Adv. No. 11-3254), 11-3255 (Docket No. 9, Adv. No. 11-3255), and 11-3521 (Docket No. 9, Adv. No. 11-3521).

<u>The Claims in the Complaint and Counterclaims</u>

In the amended complaint, Tajian seeks determination of title as to a 2006 Cadillac Escalade, determination that Debtors' debt to Tajian is excepted from discharge pursuant to Sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code, and an award of attorney fees.

In their answers and counterclaims, Debtors deny the material allegations of Tajian's complaint; assert affirmative defenses of duress, estoppel, failure of consideration, fraud, illegality, laches, release, statute of frauds, and waiver; and counterclaim for fraudulent transfer of the Escalade, conversion of the Escalade, turnover of title to the Escalade, and damages

for loss of use of the Escalade.  Debtors also seek an award of attorney fees and punitive damages.

Tajian has denied the material allegations of the counterclaims.  (Docket No. 13, Adv. No. 11-3254, Docket No. 11, Adv. No. 11-3255, Docket No. 10, 11-3521).

<u>Background</u>

Maurice Taylor played professional basketball in the National Basketball Association ("NBA") from 1997 through 2007. After 2007, Taylor continued to play professional basketball in Italy and China.

<u>All Tune & Lube Business</u>

The parties have stipulated that, during 2006, Taylor Made Automotive, LLC ("TMA"), an entity owned by Taylor, purchased real property from Tajian (the "Westgreen Property"), with financing from Prosperity Bank.  TMA operated an "All Tune & Lube" franchise at the location from 2006 through August 4, 2009. (Docket No. 52).

Tajian testified[2] that he owns nine automotive repair businesses in the greater Houston, Texas area.  (Tr. 2/28/2013, at p. 29).  He testified that he first met Taylor during July, 2009, when Taylor brought a Maybach automobile into one of

_____

[2]In this opinion, unless otherwise identified, a finding that a witness testified refers to testimony at the trial in the instant adversary proceeding.

4

Tajian's repair shops for a repair estimate.[3]  (Tr. 2/28/2013, at
p. 30).  Tajian testified that the Maybach was worth
approximately $350,000 when Taylor brought the vehicle to
Tajian's shop.[4]  (Tr. 2/27/2013, at p. 86).  Taylor testified
that Green Bank held a lien on the Maybach.  (Tr. 2/19/2013, at
p. 114).

     Taylor testified that he played basketball in Italy for
the season ending in July, 2009.  He testified that he returned
to Houston in July, 2009.  (Tr. 3/4/2013, at p. 106).

     Tajian testified that, during early July, 2009,
Taylor's business manager, Lola Slayton, contacted Tajian,
requesting that Tajian review TMA's finances and operations.[5]
Tajian testified that TMA's business was in "shambles, none of

---

[3]This testimony is not credible.  Tajian later testified
that, during 2006, when he sold the business to Taylor, he was
"coming around with Bentleys and all that."  (Tr. 2/27/2013, at
p. 70).

[4]The record does not reflect the estimated cost of repairs
to the Maybach.  Taylor signed a repair authorization.  The
authorization is dated "7/28/09," but the date does not appear to
be in Taylor's handwriting.  (Tajian Exhibit 13).  Taylor has
provided contradictory testimony as to when the Maybach was left
with Tajian's shop for repairs.  The court finds most credible
the testimony of both Tajian and Taylor that they picked up the
Maybach from Taylor's home on September 24, 2009, and it was left
at Tajian's shop after that date.

[5]Taylor testified that he directed Slayton to contact
Tajian, in an attempt to sell the business to Tajian for
$850,000.  (Tr. 2/25/2013, at p. 38).

the bills were paid, property taxes, mortgage, it didn't have insurance on the place." (Tr. 2/27/2013, at p. 61).

Ivory Williams testified that he was a manager of TMA's All Tune & Lube business during the entire time that Taylor owned the business.[6] He testified that all of the income of the business and invoices for payment of TMA's expenses were sent directly to Slayton. He testified that Slayton handled everything regarding the business. (Tr. 2/27/2013, at p. 11-12).

The parties stipulate that on August 4, 2009, Prosperity Bank foreclosed on TMA's interest in the real property.[7] (Docket No. 52).

Ivory Williams testified that, on the Thursday after the foreclosure (August 6, 2009), representatives of Prosperity Bank visited the All Tune & Lube shop, and directed Williams to close the business. Ivory Williams testified that, after he was unable to contact Taylor or Slayton, he complied with Prosperity Bank's directive. Ivory Williams testified that he met with Taylor and Tajian on the Sunday after the foreclosure (August 9, 2009). He testified that Tajian took over operation of the business when it reopened on Monday, August 10, 2009. (Tr. 2/27/2013, at p. 16-21). He testified that the business was

---

[6]Ivory Williams is married to Taylor's mother, Cathy Williams.

[7]The court takes judicial notice that August 4, 2009 was a Tuesday.

renamed "Westgreen Automotive" when Tajian took over.  (Tr. 2/27/2013, at p. 11).

Tajian testified that he negotiated with Prosperity Bank to purchase the real property.  He testified that one condition of his agreement to purchase the property was that Prosperity Bank allow him to operate the business prior to closing of the sale.  (Tr. 2/27/2013, at p. 62-63).

Ivory Williams testified that he continued to manage the business for Tajian, after Tajian took over.  (Tr. 2/27/2013, at p. 11).  He testified that he currently works for Tajian. (Tr. 2/27/2013, at p. 10).

The parties stipulate that, on September 29, 2009, Prosperity Bank sold the real property to Tajian's entity, Tajian Family Limited Partnership, Ltd., for $540,000.  (Docket No. 52).

<u>Wire Transfers</u>

The parties have stipulated that Tajian made wire transfers of $25,000 on September 3, 2009, and $50,000 on September 24, 2009, to Debtors' bank accounts.  (Docket No. 52).

Tajian testified that on September 3, 2009, Taylor requested a 30-day loan of $25,000, stating that Taylor was strapped for cash.  He testified that he ordinarily does not make such loans, but made the loan to Taylor:

> [B]ecause of -- after the All Tune & Lube situation he
> kept coming around and he made some statements about
> how the reason All Tune & Lube went down, because of
> all the money was owed to him from Italy.  He played

7

for some teams owned by Giorgio Armani.  He was owed
about almost 1.25 million, 250- should be coming in any
minute, and, you know.

And we were talking about maybe we'll be doing some
real estate investments together.  I also do
developments.  So, you know, he needed the money and I
gave it to him.

(Tr. 2/27/2013, at p. 69).

Tajian testified that he agreed to make the loan as a
personal favor to Taylor.  (Tr. 2/28/2013, at p. 49).  He
testified that the parties did not have a written agreement
regarding the terms of the loan.  (Tr. 2/28/2013, at p. 55).

Tajian testified that he requested that Taylor provide
collateral for the loan.  He testified that Taylor handed him a
bag containing two watches, which Taylor represented had a value
of $58,000.  Tajian testified that he was on his way to catch a
flight to New York, and took the watches and wired the money to
Taylor.  (Tr. 2/27/2013, at p. 71).

With respect to the $50,000 wire transfer on September
24, 2009, Tajian testified that Ivory Williams had told Tajian
that Debtor was in the process of selling the home where Ivory
Williams and Cathy Williams lived.  He testified that Taylor
requested a loan of $50,000 for three days, so that he could
provide the money for Cathy Williams to make a down payment on a
new house.  (Tr. 2/27/2013, at p. 70).

Tajian testified that he requested additional
collateral for the loan.  Tajian testified that Taylor brought

8

the title certificate for the 2006 Cadillac Escalade into Tajian's shop, to serve as collateral for the loan.  Tajian testified that he was in his private office, while his employee, Ray Gerami, was at the counter in the front of the shop.  He testified that he saw Taylor hand the title to Gerami, and Gerami handed something to Taylor, and they were writing back and forth. (Tr. 2/27/2013, at p. 83-84).  Gerami testified that Taylor signed the title certificate, and gave it to Gerami.  (Tr. 3/4/2013, at p. 52).  Tajian testified that he and Taylor then got into Taylor's white Mercedes, and drove to Taylor's home to pick up the Maybach and bring it back to Tajian's shop for repairs.  (Tr. 2/27/2013, at p. 84).  He testified that Taylor gave him a tour of the home, showing Tajian several televisions and five vehicles (the Mercedes, the Maybach, the Escalade, a Range Rover, and an antique Chevrolet Monte Carlo).  (Tr. 2/27/2013, at p. 85-87).

Tajian testified that Taylor was expressing an intention to go into business with Tajian.  He testified the discussions included the sale of the home in which Taylor lived. Tajian testified:

> I like to see nice houses, and his house was on the market because it had -- and that was the house we were discussing because he was supposed to clear 2-, $3 million out of it and he wanted to invest some money, and then the money coming from Italy, so he was going to be very okay.

(Tr. 2/27/2013, at p. 86).

Tajian testified that he relied on these representations in determining to give Taylor the $50,000. (Tr. 2/27/2013, at p. 86).

Tajian testified that the parties did not execute a written agreement with respect to the $50,000.  He testified that no written agreement was executed because he was busy, because his wife was having surgery on that day (September 24, 2009). (Tr. 2/28/2013, at p. 55-56).

Tajian testified that, after the parties left Taylor's home, they drove to Sterling Bank.  (Tr. 2/27/2013, at p. 84). He testified that he arranged the wire transfer to Taylor, and then handed the watches back to Taylor.  (Tr. 2/27/2013, at p. 72).  He testified that he drove the Maybach to the shop, and Taylor went on his way.  (Tr. 2/27/2013, at p. 84).

Taylor testified that Tajian paid him the $75,000 in exchange for Taylor's cooperation in arranging Tajian's deal with Prosperity Bank.  (Tr. 2/20/2013, at p. 100).  This self-serving testimony is not credible.

Taylor testified that Debtors used the funds received from Tajian for their personal expenses.  (Tr. 2/19/2013, at p. 55).  He testified that Debtors used $10,000 for a vacation, $5,000 to provide spending money for Tiffany Taylor, and paid other creditors, including an escrow for taxes on Debtors' former home.  (Tr. 2/19/2013, at p. 56-57).

## Title to the Escalade

As noted above, Tajian testified that Taylor brought the title certificate for the 2006 Cadillac Escalade into Tajian's shop, and handed the title certificate to Ray Gerami. Gerami testified that Taylor signed the title certificate.

Taylor testified that he kept the title certificate for the Escalade in the vehicle. (Tr. 3/4/2013, at p. 115). He testified that he maintained the title certificate in the vehicle because the vehicle was titled in Michigan, which does not require a window sticker for vehicle registration. (Tr. 3/4/2013 at p. 117). He testified that he had been pulled over by police in Texas because the vehicle had no registration sticker. (Tr. 3/4/2013, at p. 116).

Taylor testified that he did not sign the Michigan title certificate or any application for a Texas certificate of title for the Escalade at Tajian's shop. (Tr. 3/7/2013, at p. 34-35).

The Application for Texas Certificate of Title, with the attached Michigan Certificate of Title, is in evidence. Both documents contain what purport to be signatures of Maurice Taylor. The signature box on the Application for Texas Certificate of Title, which purports to bear Taylor's signature, is approximately three-sixteenths inch in height. The signature box on the Michigan Certificate of Title, which also purports to

11

bear Taylor's signature, is approximately one-quarter inch in height.  (Tajian Exhibit 30).  No handwriting expert was presented by either party.  The court has compared the purported signatures of Taylor on the Application for Texas Certificate of Title and Michigan Certificate of Title to the signature of Taylor on a statutory durable power of attorney he signed on November 13, 2009.  (Tajian Exhibit 48).  The signatures appear to match, taking into consideration the small spaces in which Taylor was to sign the Application for Texas Certificate of Title and Michigan Certificate of Title.  The court finds Ray Gerami's testimony credible.  The court finds that Taylor signed the Application for Texas Certificate of Title and Michigan Certificate of Title.

Course of Dealing Prior to Litigation

As noted above, as of September 24, 2009, Taylor's Maybach was in Tajian's shop.  Tajian had wired $25,000, and then $50,000, to Debtors.  Taylor had signed and delivered to Tajian a Michigan Certificate of Title and an Application for Texas Certificate of Title regarding the Escalade.  The Escalade remained in Debtors' possession.  Prosperity Bank had foreclosed on TMA's shop.  Tajian was operating the shop as Westgreen Automotive, but had not yet closed his purchase of the property from Prosperity Bank.

Tajian testified that, when he picked up the Maybach, it had been vandalized.  He testified that his shop stripped it down, and painted it.  (Tr. 2/28/2013, at p. 21).  He testified that, while the car was stripped, a representative from Green Bank looked at the Maybach, in order to estimate its value.  (Tr. 2/28/2013, at p. 22).

Taylor testified that, prior to September 29, 2009, his mother, Cathy Williams, was living in a house owned by Taylor. He testified that, on September 29, 2009, the house was sold.  He testified that he did not receive any funds at closing of the sale of the house.  (Tr. 3/4/2013, at p. 118).  He testified that he pre-paid rent to the new owner, in order to allow his mother to continue to occupy the property for another two months.

Taylor testified that, on November 2, 2009, Debtors returned to Houston from a trip to Las Vegas, Nevada.  (Tr. 3/7/2013, at p. 44).[8,9]

---

[8]November 2, 2009, is also the date stated on the Application for Texas Certificate of Title for the date that Taylor purportedly signed it.  Although the court concludes that the Application was signed by Taylor, the date could have been written by a different person.  The court finds, based on the testimony at trial, that the Application was signed by Taylor on September 24, 2009.

[9]Taylor previously testified, at a hearing held in state court on October 22, 2010, that the trip began on October 29, 2009.  (Tajian Exhibit 52, at p. 6).

On November 13, 2009, Maurice Taylor executed a power of attorney to permit Tiffany Taylor to act on his behalf in real property transactions.  (Tajian Exhibit 48).

Maurice Taylor testified that he also gave a power of attorney to Pete Patterson "over everything that concerned me." (Tr. 2/19/2013, at p. 91-92).[10]

Tiffany Taylor testified, at a hearing held in state court on April 23, 2010, that on November 17, 2009, Maurice Taylor left Houston, in order to play basketball in China. (Tajian Exhibit 53, at p. 9).

On December 10, 2009, Maurice Taylor emailed Tajian, requesting wiring instructions to wire funds to Tajian.  (Tajian Exhibit 4).  Taylor testified that he believed he was wiring funds to Tajian for repairs to the Maybach.  (Tr. 2/20/2013, at p. 81).  He testified he believed that the amount due on the repairs would be approximately $4,000-5,000.  (Tr. 2/20/2013, at p. 82).

On the same date, December 10, 2009, Tajian emailed Taylor with wiring instructions.  The wiring instructions did not state an amount, or the purpose of the wire transfer.  (Taylor Exhibit 17).

---

[10]The power of attorney purportedly executed in favor of Patterson is not in evidence.  Patterson was Debtors' attorney in the state court litigation.

14

In a separate email sent December 10, 2009, Taylor notified Tajian that Green Bank was picking up the Maybach as settlement for Taylor's debt to Green Bank.  (Taylor Exhibit 17).

On December 11, 2009, Tajian emailed Taylor, stating: "the Mayback [sic] will not go anywhere until we are paid in full.  There is mechanical lean [sic] on the vehicle.  Debt needs to be paid before the release of the car."  (Taylor Exhibit 17).

On December 11, 2009, Taylor, having received the wiring instructions from Tajian, emailed Tajian, telling him he would wire funds in the morning.  (Tajian Exhibit 5).

On December 13, 2009, Tajian emailed Taylor, asking whether Taylor had wired any money.  (Taylor Exhibit 17).

On December 15, 2009, Taylor emailed Tajian, stating that "[t]hey" (presumably, Taylor's bank) were asking for personal information for Tajian's account.  (Tajian Exhibit 5).

Taylor testified that he never wired funds to Tajian, as he said he would do in his December 11, 2009, email.  (Tr. 2/25/2013, at p. 23).  He testified that he has never repaid the $25,000 or $50,000 to Tajian.  (Tr. 2/19/2013, at p. 19).

Taylor testified that the funds he believed he was to wire were to pay for repairs to the Maybach.  (Tr. 2/25/2013, at p. 20).  This testimony is not credible, in light of Taylor's email advising that Green Bank was going to pick up the Maybach,

15

and Tajian's testimony that the Escalade was to serve as
collateral for Taylor's debt to Tajian.

On December 23, 2009, Tajian filed the Application for
Texas Certificate of Title with the Texas Department of
Transportation.  The Escalade was registered to Tajian on January
6, 2010.  (Tajian Exhibit 30).

On December 29, 2009, Tajian sent a letter to Debtors,
demanding turnover of the 2006 Cadillac Escalade, and threatening
that he would press auto theft criminal charges against Debtors
if the vehicle was not delivered to him by January 10, 2010.
(Tajian Exhibit 55).

### The State Court Litigation

On January 7, 2010, Debtors commenced litigation
against Tajian, in the 151st Judicial District Court of Harris
County, Texas, in Cause No. 2010-00914.  Tiffany Taylor testified
at the trial of the instant adversary proceeding that, in
connection with a request for a temporary restraining order in
the state court case, she submitted an affidavit stating that
Tajian called her home several times, threatened to take her
other car, and threatened criminal prosecution.  (Tr. 2/20/2013,
at p. 15).  She testified that Tajian never contacted her
directly, but rather she received calls from Ivory Williams,
requesting that she contact Tajian.  She testified that she

16

contacted Tajian, and that Tajian requested that she turn over the Escalade to him. (Tr. 2/20/2013, at p. 16-17).

Tiffany Taylor testified that the state court ordered that the Escalade was not to be driven. She testified that, notwithstanding that order, she drove the vehicle, March 19, 2010, from her former home (with stops to pay a utility bill and to eat a meal) to her new home. She testified that she moved Debtors' household from the previous home to the new home on that date. She testified that she had arranged for the vehicle to be towed, but that the tow company never arrived. (Tr. 2/20/2013, at p. 18-19).

Maurice Taylor testified that, since March 19, 2010, the Escalade has been parked at Debtors' new home, and has not been driven. (Tr. 2/19/2013, at p. 96).

Taylor testified that, when Debtors filed suit against Tajian in state court, they were seeking turnover of the Maybach as well as an injunction restraining Tajian from taking possession of the Escalade. (Tr. 2/19/2013, at p. 13). Taylor testified that Debtors asserted in the state court proceeding that Tajian had fraudulently obtained title to the Escalade. (Tr. 2/19/2013, at p. 18).

At the temporary injunction hearing in the state court case, Tiffany Taylor testified that the certificate of title to the Escalade was in the Escalade's glove box. She testified that

17

Debtors took the Escalade to Tajian's shop to replace its tires. (Tajian Exhibit 53, at p. 5-7).  She testified at the trial in the instant adversary proceeding that she had testified at the temporary injunction hearing that Tajian had stolen the title from the Escalade's glove box.  (Tr. 2/20/2013, at p. 27).  At the trial in the instant adversary proceeding, she testified that she had ultimately admitted, in the state court proceeding, that she did not have personal knowledge of whether the title was in the glove box.  (Tr. 2/20/2013, at p. 33).

Taylor testified that Green Bank reached an agreement with Tajian, under which Tajian was paid $13,000 by Green Bank, in satisfaction of Tajian's asserted possessory lien on the Maybach.  (Tr. 2/19/2013, at p. 18).  Tajian testified that an agreement was arranged under which Tajian would buy the car, in order to resell it.  He testified that Green Bank was avoiding being listed as the seller of the car, and so Patterson, acting on a power of attorney from Taylor, conveyed the Maybach to Tajian.  (Tr. 2/28/2013, at p. 22-25).

<u>The Decline of Debtors' Finances</u>

Taylor testified that he played professional basketball in Italy during the season ending in July, 2009.  (Tr. 3/4/2013, at p. 106).  He testified that he signed a one-year contract, with a player option for the second year, to play professional basketball in China.  (Tr. 2/25/2013, at p. 27).  He testified

18

that the team "went under and my contract went under with them." (Tr. 2/25/2013, at p. 28).

Taylor testified that, during 2009, he experienced financial difficulty. He testified that there were several lawsuits pending against him. (Tr. 2/20/2013, at p. 115). He testified that he was paid $60,000 per month while he was playing basketball in China. He testified that he set up a payment arrangement in which his pay for playing basketball was deposited into Pete Patterson's trust account, and then Patterson made payments to creditors. (Tr. 3/4/2013, at p. 119).

<u>Conclusions of Law</u>

<u>Debt</u>

Tajian must first establish that Debtors owe him a debt before he can challenge the dischargeability of the debt. <u>In re Cowin</u>, --- B.R. ----, 2013 WL 1786026 (Bankr. S.D. Tex. 2013); <u>In re Ekuban</u>, 177 Fed. Appx. 407 (5th Cir. 2006).

Under Section 26.02(b) of the Texas Business and Commerce Code, a loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative. Tex. Bus. & Comm. Code § 26.02(b).

In the instant case, Tajian made two loans to Debtors. Neither exceeded $50,000 in value.  Thus, the two loans are enforceable.

### Dischargeability

Tajian has sought a determination that the debts are nondischargeable, under Sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code.  The creditor must prove by a preponderance of the evidence that the debt is nondischargeable.  <u>Grogan v. Garner</u>, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Section 523(a)(2)(A) of the Bankruptcy Code provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
>
> * * *
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

For a debt to be nondischargeable under Section 523(a)(2)(A), the creditor must show: (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the

creditor sustained a loss as a proximate result of its reliance. In re Acosta, 406 F.3d 367 (5th Cir. 2005), citing In re Mercer, 246 F.3d 391 (5th Cir. 2001).

An intent to deceive may be inferred from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.  In re Acosta, 406 F.3d 367 (5th Cir. 2005).

In the instant case, Tajian presented no evidence that Taylor made any representations as to the $25,000 loan on September 3, 2009.  The evidence is that Taylor requested a personal loan, and Tajian made the loan.

As to the $50,000 loan on September 24, 2009, Tajian's evidence shows that the representation made by Taylor was the purpose to which the loan proceeds would be put.  In order for a debtor's representation to be a false representation or false pretense under Section 523(a)(2), it must have been a knowing and fraudulent falsehood, describing past or current facts, that was relied upon by the other party.  Recoveredge, L.P. v. Pentecost, 44 F.3d 1284 (5th Cir. 1995), citing Allison v. Roberts (In re Allison), 960 F.2d 481 (5th Cir. 1992).  The representation made by Taylor was not a representation as to past or current facts, but rather a representation as to the future disposition of the funds.  As such, it is not actionable under Section 523(a)(2)(A) as a false representation or false pretense.  Moreover, aside

21

from self-serving conclusory testimony, Tajian has not demonstrated justifiable reliance.[11]   Tajian's testimony is that in making the $50,000 loan, Tajian relied on his own estimate of the strength of Debtor's finances, as shown by a tour of Debtors' house, and on Tajian's taking of collateral for the loan, rather than on any representation made by Taylor.

Tajian suggests that the court should infer, from a string of what Tajian asserts to be inconsistencies and falsehoods between the affidavits submitted in state court, the testimony in state court, and the testimony in this court, an intent to defraud beginning with the initial making of the loan, continuing through all the litigation in state court, and including the instant case and adversary proceeding.  There is insufficient support in the evidence for such an inference.[12] The court concludes that Tajian has not sustained his burden of proof with respect to an exception to discharge under Section 523(a)(2)(A) of the Bankruptcy Code.

---

[11]The court notes that Tajian did not seek to document the loans.

[12]The court notes that Debtors' filings of what were false affidavits in the state courts are reprehensible.  The court declines to infer a fraudulent intent, in light of the facts that Maurice Taylor (who appears to have had personal knowledge of the material facts) was in China and relatively inaccessible, while Tiffany Taylor (who appears to have had little or no knowledge of the material facts) and Pete Patterson (who knew or should have known the material facts, and had an obligation of candor to the courts) were seeking emergency relief in the United States.

22

Section 523(a)(4) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -

* * *

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

11 U.S.C. § 523(a)(4).

Tajian has presented no evidence that Debtors acted in a fiduciary capacity.

Embezzlement is defined for purposes of Section 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.  To meet the definition of embezzlement, there must be proof of the debtor's fraudulent intent in taking the property.  <u>Miller v. J.D. Abrams Inc. (Matter of Miller)</u>, 156 F.3d 598 (5th Cir. 1998).

There is insufficient evidence as to Taylor's fraudulent intent in obtaining the $25,000 loan and the $50,000 loan from Tajian.

Larceny is not defined in the Bankruptcy Code.  Its meaning in Section 523(a)(4) is governed by federal common law. The common law definition of larceny is a felonious taking of another's personal property with intent to convert it or deprive the owner of same.  <u>In re Cowin</u>, --- B.R. ----, 2013 WL 1786026

23

(Bankr. S.D. Tex. 2013), citing In re Smith, 253 F.3d 703 (5th Cir. 2001)(unpublished).

In the instant case, Debtors came into possession of the funds transferred by Tajian lawfully.  Thus, larceny does not apply.  See Miller v. J.D. Abrams Inc. (Matter of Miller), 156 F.3d 598 (5th Cir. 1998).  The court concludes that Tajian has not sustained his burden of proof with respect to an exception to discharge under Section 523(a)(4) of the Bankruptcy Code.

<u>Ownership of the Escalade</u>

Section 501.071(a) of the Texas Transportation Code provides that a motor vehicle may not be the subject of a subsequent sale unless the owner designated on the title submits a transfer of ownership of the title.  Tex. Transp. Code § 501.071(a).  A forged certificate of title passes no title to the vehicle.  Drake Ins. Co. v. King, 606 S.W.2d 812 (Tex. 1980).

In the instant case, Taylor was the owner designated on the title, and he submitted a transfer of ownership of the title.  Thus, title to the Escalade properly rests with Tajian.

However, determining title does not end the inquiry.  Debtors' contention is that the title was acquired by fraud or theft.  The evidence does not support Debtors' contention.  Tiffany Taylor's testimony that the title certificate was removed from the glove box is not credible, in light of her testimony that she lacked personal knowledge.  The court finds Maurice

24

Taylor's signature on the Michigan Certificate of Title and the Application for Texas Certificate of Title to be persuasive evidence that the title was not stolen from the glove box of the Escalade.  The court concludes that title to the Escalade properly rests with Tajian.

Counterclaims

Debtors' evidence does not support the counterclaims contained in their various answers.

Attorney Fees

Both sides in the instant matter have requested an award of attorney fees.  At the trial, Tajian submitted an exhibit identifying $60,102.07 in attorney fees and expenses in the state court matter.  (Tajian Exhibit 34).  After the trial, Tajian submitted affidavits regarding attorney fees and expenses identifying a total of $18,594.18 in fees and expenses for David W. Anderson, and $47,897.50 in fees and expenses for Joan Lucci Bain, for conduct of the instant adversary proceeding.  (Docket No. 89).  Debtors submitted an invoice for $148,631 in fees and expenses for their counsel, Reese Baker.  (Docket No. 91).

An action under Section 523 of the Bankruptcy Code is governed by the "American Rule," that each party bears its own attorneys' fees.  Creditors are only entitled to recover attorneys' fees if they have a contractual right to them under state law.  In re Ayesh, 465 B.R. 443 (Bankr. S.D. Tex. 2011).

25

Under Texas law, attorneys' fees may not be recovered unless provided by statute or by contract between the parties. In re Bigler LP, 458 B.R. 345 (Bankr. S.D. Tex. 2011).

In the instant case, no statute provides for an award of attorneys' fees.  The parties' oral contract does not provide for an award of attorneys' fees.  The court concludes that Tajian may not recover attorneys' fees.

Section 523(d) of the Bankruptcy Code governs the award of attorneys' fees to debtors defending an adversary proceeeding to except a debt from discharge.  That section provides:

> (d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

The term "consumer debt" means debt incurred by an individual primarily for a personal, family, or household purpose.  11 U.S.C. § 101(8).

In the instant case, Taylor's testimony establishes that the underlying debt was incurred primarily for personal or household purposes.  Although the debt is to be discharged, the position of Tajian was substantially justified, in light of Debtors' continued retention of the Escalade, and Debtors' false

26

affidavits in state court.  Moreover, as addressed below, there are special circumstances in the instant case that would make an award of fees unjust.

Both sides have sought an award of attorneys' fees as a sanction or an element of punitive damages.  The court is aware of authority for the proposition that, as an exception to the American Rule, courts have the inherent power to issue sanctions against litigants for their bad faith conduct and that a court may assess attorney's fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  In re Pastran, 462 B.R. 201 (Bankr. N.D. Tex. 2011), citing NASCO, Inc. v. Calcasieu Television & Radio, Inc., 894 F.2d 696 (5th Cir. 1990), aff'd sub nom. Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) and Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 255-60, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).  The threshold for invocation is high and if such inherent power is invoked, it must be exercised with restraint and discretion.  Pastran, 462 B.R., at p. 210, citing Maguire Oil Co. v. City of Houston, 143 F.3d 205 (5th Cir. 1998).  Accordingly, a court should only invoke its inherent power if it finds that a fraud has been practiced upon it or that the very temple of justice has been defiled.  Id., citing Boland Marine & Mfg. Co. v. Rihner, 41 F.3d 997 (5th Cir. 1995).

In the instant case, the parties have had a dispute over two loans totaling $75,000, secured by a used automobile. Through aggressive litigation tactics of two sets of counsel on both sides,[13] the parties have collectively amassed legal fees in excess of $270,000, rather than reaching a reasonable resolution. It appears that the attorneys on both sides acted without regard for the ultimate financial interests of their clients, but rather geared up for war at the slightest provocation.  The court declines to invoke its inherent power to award attorneys' fees to either side.

Based on the foregoing, a separate conforming Judgment will be entered.

Signed at Houston, Texas on July 16, 2013.


_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE

---

[13]Including Bain and Anderson for Tajian, and Patterson and Baker for Debtors.

28